## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                            |     |                              |
|----------------------------|-----|------------------------------|
|                            |  :  |                              |
| STEVE WILLIAMSON           |  :  |                              |
|                            |  :  |                              |
| v.                         |  :  |                              |
|                            |  :  | Civil Action No. CCB-07-1147 |
| OFFICER DAVID GRANT, et al.|  :  |                              |

...o0o...

## <u>MEMORANDUM</u>

Now pending before the court is a motion to dismiss or, in the alternative, for summary judgment, filed by defendants Officers David Grant, Eric Lloyd, and Aileen Pratt, and Corporal Duane Urban of the Maryland Transportation Authority ("defendants").[1]  Plaintiff Steve Williamson asserts numerous federal and state claims against the defendants stemming from his forcible arrest on July 8, 2005, including claims of false arrest under the Fourth Amendment, the Maryland Declaration of Rights, and state law (Counts I, II, & IV); excessive force under the Fourth Amendment and the Maryland Declaration of Rights (Counts I & II); battery (Count III); and malicious prosecution (Count V).[2]  The issues in this case have been fully briefed and no

---

[1] Defendants Corporal Jane Neutzel and Lieutenant Richard Ricko also joined in this motion.  However, plaintiff now intends to file a Stipulation of Dismissal with Prejudice with respect to these two defendants.  (Pl.'s Opp. at 1.)  Accordingly, claims against them will be dismissed; the term "defendants" in this opinion will refer only to the remaining defendants.

[2] In Count I of his complaint, Mr. Williamson also asserts that his Fourteenth Amendment rights were violated by his arrest.  To the extent Mr. Williamson understands this assertion to encompass an excessive force claim, such a claim is properly analyzed under the Fourth Amendment and not the Fourteenth Amendment in this context.  *Compare Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002), *with Taylor v. McDuffie*, 155 F.3d 479, 482-83 (4th Cir.1998).  To the extent Mr. Williamson, an African American, understands this assertion to encompass an Equal Protection Clause selective enforcement claim (*see* Def.'s S.J. Mot. at Ex. 2, Williamson Dep. at Ex. 8), the facts preclude relief on this basis.  Many of the people in the immediate vicinity of Mr. Williamson at the time of his arrest were African American (*see, e.g.*,

hearing is necessary.  For the reasons stated below, the defendants' motion, construed as a

motion for summary judgment, shall be granted as to the federal claims; the state law claims

shall be dismissed without prejudice.

## BACKGROUND

On July 8, 2005, Mr. Williamson was among approximately 188 passengers scheduled to

fly to Kingston, Jamaica aboard Air Jamaica flight number 40, departing Baltimore-Washington

International ("BWI") Airport at 8:30 a.m.  The flight boarded normally, but unfortunately did

not take off for roughly three hours, during which time the passengers became increasingly

frustrated by the delay, the heat of the plane's cabin, and other annoyances.  Eventually, the

passengers were instructed to disembark and return to the boarding gate, where they were made

to wait through several more announcements.  Finally they were told that flight number 40 was

postponed, and that they should return to the Air Jamaica ticket counter to obtain meal vouchers

and/or book a different flight if they so desired.

By the time the passengers assembled at the Air Jamaica ticket counter, they were

noticeably agitated.  Mr. Williamson recalls that by the time he arrived in the vicinity of the

_____

*id.* at 129), as were two of the officers involved – Officers Grant and Pratt.  (*See* Def.'s S.J. Mot.
at Ex. 1, Trial Trans. at 2-111; Def.'s S.J. Mot. at Ex. 2, Williamson Dep. at 133; Pl.'s Opp. at
Ex. 1, O'Connor Dep. at 12, 20, & 22-23.)  No inference of selective enforcement can be drawn
where no other persons – of any race – were arrested, and where his arrest was carried out in
large part by another African American (Officer Grant).  More importantly, Mr. Williamson has
brought forward no evidence showing that his arrest was the product of "a deliberate selective
process of enforcement based upon race" by the Maryland Transportation Authority, a showing
which he is required to make in order to succeed on his selective enforcement claim.  *See Butler
v. Cooper*, 554 F.2d 645, 646 (4th Cir. 1977).  Accordingly, Count I will be dismissed with
respect to its Fourteenth Amendment allegations for failure to state a claim.  *See* Fed. R. Civ. P.
12(b)(6); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

ticket counter, the scene was "probably not quite chaos yet but bordering. There was a lot of

frustration," with people hollering and making a lot of commotion. (Def.'s S.J. Mot. at Ex. 2,

Williamson Dep. at 119-20; *see* Def.'s S.J. Mot. at Ex. 8, Colvin Dep. at 42 (describing the scene

as "just crazy" and "chaotic").) The airline had set up two lines, one on the left of the counter

for re-booking, and one on the right of the counter for meal vouchers, although passengers had

not lined up in an orderly fashion, but had rather formed a large crowd in front of the counter,

with many pressing right up against it. Wanting information on re-booking, Mr. Williamson

walked around the crowd and up to the lefthand side of the ticket counter so that he could hear

what the airline agent there, Ms. Lorna Hentley, was saying about re-booking options. This

positioned him at the left edge of the crowd and very near its front, just a few feet from the Air

Jamaica ticket counter and near the adjacent Iceland Air counter to its left.

At around this time, Ms. Hentley announced that the flight was going to be delayed

further, and that the airline planned to use an inbound plane, arriving into BWI at 9:00 p.m., to

take the passengers to Jamaica. Her announcement was interrupted by yelling from the crowd,

and once it had been made, "everything just went crazy." (Def.'s S.J. Mot. at Ex. 8, Colvin Dep.

at 36; *see* Def.'s S.J. Mot. at Ex. 7, Hentley Dep. at 37 (recounting that "everybody was

shouting" after she made her announcement).) At this point, given the increasingly unruly

behavior of the crowd, Ms. Hentley asked her colleague at the ticket counter, Ms. Arlyce Colvin,

to call the Maryland Transportation Authority ("Authority") police for crowd control, which she

did.[3]

---

[3] At about this time, U.S. Air Force staff sergeant Reagan O'Connor, stationed at BWI, had noticed the troubling commotion and had also called the Authority police for assistance. (Pl.'s Opp. at Ex. 1, O'Connor Dep. at 3 ("All of the passengers . . . just got really angry,

The first police officer to arrive at the scene was Officer Pratt.  Seeing the size[4] and

demeanor of the crowd as she approached, she called for back up.  (*See* Def.'s S.J. Mot. at Ex. 3,

Pratt Dep. at 17 (describing the scene in this way: "The crowd was angry.  They were shoulder to

shoulder actually at the counter for Air Jamaica, yelling across the counter to agents."); *see id.* at

21.)  When she reached the front of the crowd, she stood up on the baggage scale between the

Air Jamaica and Iceland Air counters, announced – incorrectly – that the flight was cancelled,

and then ordered the passengers to move away from the counter.  Mr. Williamson admits hearing

both the cancellation announcement and the order to move away from the counter, and further

admits not complying with any such order until Officer Grant arrived.  (Def.'s S.J. Mot. at Ex. 2,

Williamson Dep. at 137-39 & 141.)  Officer Pratt's mistaken announcement caused the crowd to

become even louder and more unruly, and her order to move away from the counter was ignored.

(*See* Def.'s S.J. Mot. at Ex. 8, Colvin Dep. at 44 (recalling the crowd's reaction to Officer Pratt's

mistaken announcement as "[i]nsanity, totally, insanity"); *id.* at 46 (observing that the crowd

"lunged forward" after her announcement).)  Officer Pratt recalls making the announcement to

move away from the counter many times to no avail.  (Def.'s S.J. Mot. at Ex. 3, Pratt Dep. at 19.)

Officer Grant arrived on the scene at about this time.  Upon arriving, he came up to the

front of the crowd, ordered crowd members to move away from the ticket counter, and then

began to move along the front of the counter and physically move people away from it.  Mr.

---

disorderly, loud.  And I thought I needed to call the police, because incidents like that, you
know, personnel here (inaudible) protect our fellow employees.").)

[4] Accounts differ on how many of the 188 passengers from the flight were in the crowd,
but it appears that at least 135 were present.  (*See, e.g.*, Def.'s S.J. Mot. at Ex. 1, Trial Trans. at 2-
200 (Williamson recalling the number as 150 people or more); Def.'s S.J. Mot. at Ex. 5, Urban
Dep. at 13 (estimating the crowd at 135); Def.'s S.J. Mot. at Ex. 6, Lloyd Dep. at 11.)

Williamson remembers hearing this instruction, and testified that he obeyed by stepping back. (Def.'s S.J. Mot. at Ex. 2, Williamson Dep. at 139, 141, 146-47, & 152.)  Officer Grant remembers it differently.  After ordering people "several times" to back away, he alleges he noticed that "an unidentified individual, who is known to be Mr. Williamson, did not move away from the ticket counter [and was] having a belligerent conversation with the ticket counter personnel."[5]  (Def.'s S.J. Mot. at Ex. 4, Grant Dep. at 43.)  Regardless of what was heard or said at that moment, it is undisputed that Officer Grant then pushed Mr. Williamson in the chest to move him away from the counter.

At this point, accounts differ greatly.  Mr. Williamson contends that, when he was pushed, he backed up and said something to the effect of "Why are you pushing me?  I'm already backing up."  (Def.'s S.J. Mot. at Ex. 2, Williamson Dep. at 152; *see* Compl. ¶ 17.)  His apparent compliance and statements had no effect, though, as Corporal Urban presently appeared on the scene, said "He's going down," and then jumped on his back.  (*Id.* at 153.)  Simultaneously, Officer Lloyd, also newly on the scene, scooped Mr. Williamson's legs out from under him so that he would fall to the ground, at which point all four men – Williamson, Grant, Urban, and Lloyd – fell onto the baggage scale between the Air Jamaica and Iceland Air counters, and a struggle ensued.  Mr. Williamson recalls falling head-first onto the scale, being put in a stranglehold by Officer Grant, and being repeatedly hit on his wrist with handcuffs by Officer Urban, but cannot remember much else about the altercation until he was outside the airport afterward in handcuffs, awaiting transport to the police station.  (*See id.* at 164 ("To this

---

[5] This recollection is corroborated by the testimony of Officer Pratt, who remembers Mr. Williamson remaining standing at the front of the crowd despite more than one command from Officer Grant to move back.  (Def.'s S.J. Mot. at Ex. 3, Pratt Dep. at 30.)

day I don't know how my hands got behind my back.  I don't even know how I got outside.").)

Officer Grant contends that, after he shoved Mr. Williamson away from the counter, Mr. Williamson "took a defensive stand by balling his fists up" and stiffening his arms "as if he [was] ready to fight."  (Def.'s S.J. Mot. at Ex. 4, Grant Dep. at 60-61; *see* Def.'s S.J. Mot. at Ex. 3, Pratt Dep. at 30 & 36 (remembering seeing Mr. Williamson stiffen his arms, ball his fists, and thrust his chest out after being pushed); Def.'s S.J. Mot. at Ex. 5, Urban Dep. at 20 (remembering seeing Mr. Williamson "tense[] up"); Def.'s S.J. Mot. at Ex. 6, Lloyd Dep. at 26 ("he clenched his fists and lunged towards Officer Grant").)  He also asserts that Mr. Williamson said something like "I am solid muscle."  (*Id.* at 62; *see* Def.'s S.J. Mot. at Ex. 5, Urban Dep. at 12 (remembering Mr. Williamson making "defiant statements" to Officer Grant "to the effect that he was not going to comply with Officer Grant's order").)  Officer Grant then recalls Corporal Urban arriving and ordering him to arrest Mr. Williamson.  (*See* Def.'s S.J. Mot. at Ex. 5, Urban Dep. at 18-19 (Corporal Urban recalling directing Officer Grant to arrest Mr. Williamson with the phrase:  "He is going downtown").)  Officer Grant then told Mr. Williamson he was under arrest, and Mr. Williamson replied, "you can't arrest me," and when Officer Grant then reached for his right arm to put it behind his back, he resisted by pulling away.  (Def.'s S.J. Mot. at Ex. 4, Grant Dep. at 70-72; *see* Def.'s S.J. Mot. at Ex. 5, Urban Dep. at 20.)

Seeing Mr. Williamson's resistance, Corporal Urban immediately began to assist Officer Grant by grabbing Mr. Williamson's right arm from behind, but at this point he and the other officers fell onto the baggage scale, with Corporal Urban landing on the bottom, beneath Mr. Williamson.  In the ensuing scuffle, Mr. Williamson allegedly kicked and flailed his arms and

otherwise resisted arrest, despite repeated orders by Officer Grant and Officer Urban to stop

resisting.  (Def.'s S.J. Mot. at Ex. 4, Grant Dep. at 75-77 & 84; *see* Def.'s S.J. Mot. at Ex. 6,

Lloyd Dep. at 31 (hearing someone saying "[s]top resisting") & 36 (describing Mr. Williamson

as "flailing and kicking on the scale").  His actions caused Officer Grant "[e]xcruciating pain"

(Def.'s S.J. Mot. at Ex. 4, Grant Dep. at 91), and Officer Grant would later have to undergo

months of physical therapy for a shoulder injury he sustained during the altercation.  Officer

Lloyd claims he got involved in the scuffle at this point by forcibly moving Mr. Williamson off

of Corporal Urban and onto the ground for handcuffing.  In the process, Mr. Williamson landed

on Officer Lloyd's right hand, fracturing it.  Mr. Williamson was finally cuffed, lifted off the

ground, and escorted outside to a patrol car.  He was then taken into custody and later released

on bail.

      Mr. Williamson contends that he sustained several injuries during the arrest, including a

bruise on his head from the fall, injuries to both shoulders, a sore back, and swelling and

lacerations at his wrists from the handcuffs.  When he went to the hospital for an examination

after his release from police custody, he says he was also given a neck brace, a sling for his left

arm, and pain medications.  Most of these injuries have since healed.[6]

      As a result of this altercation, the State of Maryland brought criminal charges against Mr.

Williamson in the Circuit Court for Anne Arundel County, charging him with one count of

disorderly conduct in violation of Md. Code Ann., Crim. Law § 10-201(c)(2); one count of

failure to obey a reasonable and lawful order of a law enforcement officer in violation of Md.

---

[6] Although he claims injuries to his left thumb and shoulder have never fully healed, he admits never having sought treatment for any of his injuries after that initial hospital visit. (Def.'s S.J. Mot. at Ex. 2, Williamson Dep. at 167-170.)

Code Ann., Crim. Law § 10-201(c)(3); one count of resisting lawful arrest in violation of Md.

Code Ann., Crim. Law § 9-408(b)(1); and two counts of assault (against Officers Grant and

Urban) in violation of Md. Code Ann., Crim. Law § 3-203(c)(2).  A bench trial was held on these

charges on March 16 and May 31, 2006, and Mr. Williamson was found not guilty on all counts.

Mr. Williamson now brings this civil action.


## ANALYSIS

Where matters outside the pleadings are considered by the court, a defendant's motion to

dismiss will be treated as one for summary judgment under Rule 56.  *See* Fed. R. Civ. P. 12(b) &

(c); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).  Rule 56(c) of the Federal Rules of Civil

Procedure provides that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file,
> and any affidavits show that there is no genuine issue as to any material fact and that
> the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  The Supreme Court has clarified this does not mean that any factual

dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged
> factual dispute between the parties will not defeat an otherwise properly supported
> motion for summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### A. Federal § 1983 Claims and Qualified Immunity

Defendants assert they are entitled to summary judgment on Mr. Williamson's federal false arrest and excessive force claims on grounds of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This protection is extended to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court held that a court considering a federal claim of qualified immunity must proceed in two steps. First, it must consider the threshold question of whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officers' conduct violated a constitutional right. 533 U.S. at 201. If the court finds no constitutional violation, then there is no need to inquire further into qualified immunity. *Id.* at 201. If, however, the court finds a constitutional violation, then it must proceed

9

to the second step: determining whether the right was "clearly established" at the time of the

violation.  *Id.*

Recently in *Pearson*, the Supreme Court relaxed *Saucier*'s "inflexible requirement" of a

two-step analysis.  *Pearson*, 129 S.Ct. at 813.  It held as follows:

> On reconsidering the procedure required in *Saucier*, we conclude that, while the
> sequence set forth there is often appropriate, it should no longer be regarded as
> mandatory.  The judges of the district courts and the courts of appeals should be
> permitted to exercise their sound discretion in deciding which of the two prongs of
> the qualified immunity analysis should be addressed first in light of the
> circumstances in the particular case at hand.

*Id.* at 818.  The Court acknowledged that, while there are cases for which the two-step procedure

is beneficial, there are also cases for which an adherence to that procedure would waste judicial

resources and potentially create a risk of bad decisionmaking.  *Id.* at 818-20.  It therefore

deferred to "judges of the district courts and the courts of appeals" to "determine the order of

decisionmaking [that] will best facilitate the fair and efficient disposition of each case."  *Id.* at

821.

Because, on the facts as alleged, this case presents a close question as to the

constitutionality of the arrest and the force used, I will proceed to the second step of the qualified

immunity analysis first.  The second step of the qualified immunity analysis requires the court to

ask "whether it would have been clear to a reasonable officer that his conduct was unlawful in

the situation he confronted."  *Saucier*, 533 U.S. at 202.  This determination is not made from the

vantage point of "skilled lawyers and learned judges," but rather from the vantage point of "an

objectively reasonable official in similar circumstances at the time of the challenged conduct."

*Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotations and citations omitted); *see*

*Graham v. Connor*, 490 U.S. 386, 397 (1989); *Orem v. Rephann*, 523 F.3d 442, 448-49 (4th Cir.

2008) (engaging in an objective reasonableness analysis to determine if qualified immunity

applied); *Jones v. Buchanan*, 325 F.3d 520, 531 (4th Cir. 2003) ("[t]he standard is . . . one of

objective reasonableness").  Accordingly, in order for qualified immunity protection not to

apply, "[t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640

(1987).

The determination at this second step is also informed by prevailing cases at the time of

the conduct in question that may have provided the officer with "fair warning" that his conduct

was or was not constitutional.  *See Buchanan*, 325 F.3d at 531-32.  These cases, when factually

similar, may provide "especially strong support for a conclusion that the law is clearly

established," though factually similar cases are not necessary to reach such a conclusion.  *Id.*

(internal quotations and citation omitted).

In short, if a reasonable officer could have believed his conduct was lawful, in light of the

factual circumstances and prevailing case law at the time, then the court may apply qualified

immunity.  *See Iko*, 535 F.3d at 237-38 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640

(1987)).


*i. Unlawful Arrest*

Mr. Williamson first claims that his arrest constituted an unreasonable seizure in

violation of the Fourth Amendment.  By July 2005, the period when the disputed arrest occurred,

it was clearly established that arrests not based upon probable cause are unconstitutional.  *See,*

*e.g.*, *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *Brown*, 278 F.3d at 367.  The relevant

question on this claim, then, is whether it was objectively reasonable for the defendants to

believe that there was probable cause to arrest Mr. Williamson.

Probable cause is determined by examining "the totality of circumstances known to the

officer at the time of the arrest."  *Brown*, 278 F.3d at 367.  This examination is guided by two

principles: first, that probable cause is a "practical, nontechnical conception" involving "factual

and practical considerations of everyday life on which reasonable and prudent men, not legal

technicians, act," *Gomez v. Atkins*, 296 F.3d 253, 262 (4th Cir. 2002) (quoting *Brinegar v.*

*United States*, 338 U.S. 160, 175-76 (1949)); second, that evidence of probable cause "must be

seen and weighed not in terms of library analysis by scholars, but as understood by those versed

in the field of law enforcement." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983).)

Accordingly, for probable cause to exist, "there need only be enough evidence to warrant the

belief of a reasonable officer that an offense has been or is being committed; evidence sufficient

to convict is not required."  *Brown*, 278 F.3d at 367.

Here, the undisputed facts show that the defendants were confronted with a loud and

angry crowd of roughly 150 passengers who were not obeying direct orders from Officer Pratt.

The level of commotion had caused two airport employees to call for police assistance out of

concerns for their safety, and had caused Officer Pratt to call for backup when she first arrived at

the scene.  When Officer Grant later arrived, he also had safety concerns.  (Def.'s S.J. Mot. at

Ex. 4, Grant Dep. at 150 ("the crowd could have gotten out of control and, you know, officers

could get injured").)  The admitted noncompliance of Mr. Williamson and other members of the

crowd with Officer Pratt's orders in this volatile situation could constitute probable cause to

12

arrest for disobeying a reasonable and lawful order, and the undisputed unruliness of the crowd,

which Mr. Williamson himself described as bordering on chaos, could give officers probable

cause to arrest for disorderly conduct. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354

(2001); *Carter v. Jess*, 179 F. Supp. 2d 534, 546 (D. Md. 2001) (finding probable cause to arrest

where plaintiff failed to obey lawful order to exit crime scene); *see also Spry v. State*, 914 A.2d

1182, 1188 (Md. 2007) (failure to move when told by an officer to do so "may endanger the

public peace" and "amount[] to disorderly conduct") (internal quotations and citation omitted).

Beyond this evidence of noncompliance among the crowd generally, however, Officer

Grant reasonably believed Mr. Williamson in particular to be noncompliant. When he gave

orders to move away from the ticket counter, he recalls seeing Mr. Williamson fail to do so.

When he then pushed Mr. Williamson to force him to obey the order,[7] all officers testified that

Mr. Williamson, rather than submitting to police authority, took a defensive posture. Corporal

Urban, who ordered the arrest, reported seeing Mr. Williamson not only fail to comply with

Officer Grant's order but also proceed to make defiant statements of noncompliance to Officer

Grant.

Viewing the above facts in the light most favorable to Mr. Williamson, but mindful of the

totality of the circumstances known to the defendants at the time – including the heightened

agitation of the crowd and the admitted noncompliance of Mr. Williamson, at least with Officer

Pratt's order – the court finds the defendants could have reasonably believed that there was

probable cause to arrest Mr. Williamson. Accordingly, qualified immunity applies to this claim.

---

[7] Such a push is not unreasonable under these circumstances. *See Graham*, 490 U.S. at 386; *see also infra* Subsection A.ii.

*Cf. Brown*, 278 F.3d at 368.


### ii. Excessive Force

Mr. Williamson next claims that the defendants used unconstitutionally excessive force

against him when making their arrest.  By July 2005, it was clearly established that the force

used by officers during an arrest will be found unconstitutional if it is not "objectively

reasonable in light of the facts and circumstances confronting them, without regard to their

underlying intent or motivation."  *Graham*, 490 U.S. at 397; *see, e.g.*, *Buchanan*, 325 F.3d at 527

& 532.  It was also clearly established that the objective reasonableness of the force used is to be

considered with an eye both to the split-second judgments law enforcement officers are often

compelled to make about degrees of force, *see, e.g.*, *Graham*, 490 U.S. at 397, and the ambiguity

of many law enforcement situations that may cause reasonable mistakes in calculations of the

force required.  This court must determine, then, whether the defendants' belief in the lawfulness

of their application of force was objectively reasonable, in light of the clearly established

precedent above and the particular facts of this case.

The facts show that the scene the defendants faced at the Air Jamaica ticket counter was

sufficiently volatile that all members of the crowd, particularly those nearest the ticket counter,

could be perceived as posing an immediate threat to the safety of the airline agents, a perception

bolstered by the fact that the agents themselves had called for police assistance.  Officers Grant

and Pratt distinctly remember Mr. Williamson refusing their multiple orders to move away from

the ticket counter, and after Officer Grant pushed Mr. Williamson back, all defendants

remembered seeing Mr. Williamson assume a defensive posture, raising the possibility that he

might pose a threat to the officers' safety.  Once Corporal Urban ordered his arrest, Mr.

Williamson's resistance to police commands appeared to continue unabated, even after he was

on the ground, until defendants were able to handcuff him successfully.[8]  (*See* Def.'s S.J. Mot. at

Ex. 4, Grant Dep. at 77-95.)

Given the ambiguity and volatility of the situation the defendants confronted, the court

finds that their belief in the lawfulness of the force used – force that ceased as soon as Mr.

Williamson was restrained[9] – was not objectively unreasonable.  Accordingly, qualified

immunity applies to this claim as well.  *See Saucier*, 533 U.S. at 208-09 (finding qualified

immunity to apply where there was no clearly established rule prohibiting officer from grabbing

protester and shoving him into a van during a potentially volatile situation).


## B. State Law Claims

Mr. Williamson also brings a variety of state law claims, as to some of which, but not all,

state law immunity may apply.  Because no federal claims survive, this court declines to exercise

supplemental jurisdiction over these remaining claims.  28 U.S.C.A. § 1367(c)(3); *see Jordahl v.*

---

[8] Indeed, if the testimony of Officer Grant is to be believed, Mr. Williamson was so active in his resistance that Corporal Urban felt the need to consider using pepper spray to subdue him.  (Def.'s S.J. Mot. at Ex. 4, Grant Dep. at 93.)

[9] This fact is important to the objective reasonableness inquiry, as it suggests that the force used was limited to ensuring the safety of those present. *Compare Wilson v. Flynn*, 429 F.3d 465, 468-69 (4th Cir. 2005) (finding no excessive force where police stopped using force after handcuffs were placed on plaintiff), *with Young v. Prince George's County*, 355 F.3d 751, 757-58 (4th Cir. 2004) (finding excessive force where officer placed already-handcuffed plaintiff in a headlock, threw him head-first to the ground, and then beat him, even though plaintiff was fully cooperating); *Bailey v. Kennedy*, 349 F.3d 731, 744 (4th Cir. 2003) (finding excessive force where, during an arrest, officers caused "severe injuries" to a man who posed no threat to the safety of others and whom they knew had committed no crime).

*Democratic Party of Virginia*, 122 F.3d 192, 203 (4th Cir. 1997) (finding no abuse of discretion

where district court, after dismissing federal § 1983 claims, declined to exercise supplemental

jurisdiction over the remaining state law claims).  Accordingly, these claims shall be dismissed

without prejudice.


<u>**CONCLUSION**</u>

For the foregoing reasons, the defendants' motion to dismiss or, in the alternative, for

summary judgment shall be construed as a motion for summary judgment and shall be granted as

to the federal claims.  A separate Order follows.


_____June 9, 2009_____                                    _____/s/_____
Date                                                                    Catherine C. Blake
                                                                           United States District Judge